**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IRVIN L. BRANDON, ) | |
| ) | CASE NO.    1:09-cv-00857 |
| Plaintiff, ) | |
| ) | |
| v. ) | JUDGE JOHN R. ADAMS |
| ) | |
| MICHAEL J. ASTRUE, ) | MAGISTRATE JUDGE GREG WHITE |
| Commissioner of Social Security ) | |
| ) | **REPORT AND RECOMMENDATION** |
| Defendant. ) | |

Plaintiff Irvin L. Brandon ("Brandon") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq*.  The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.

For the reasons set forth below, the Magistrate Judge recommends that the final decision of the Commissioner be AFFIRMED.

### I.  Procedural History

On November 8, 2005, Brandon filed an application for SSI alleging a disability onset date of October 1, 2005, and claiming that he was disabled due to depression.  His application was denied both initially and upon reconsideration.  Brandon timely requested an administrative hearing.

On August 28, 2008, an Administrative Law Judge ("ALJ") held a hearing during which Brandon, represented by counsel, testified. Thomas F. Nimberger testified as the vocational

expert ("VE"). On October 15, 2008, the ALJ found Brandon was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

On appeal, Brandon claims the ALJ erred by: (1) failing to give appropriate weight to the opinion of Dr. Chavinson; (2) failing to fully evaluate the opinion of Dr. Josell; and (3) failing to assess the credibility of Daniella Leone.

## II. Evidence

*Personal and Vocational Evidence*

Born on June 21, 1975, and age thirty-three at the time of his administrative hearing, Brandon is a "younger" person under social security regulations. *See* 20 C.F.R. § 416.963(c). Brandon has a limited education and no past relevant work.

*Medical Evidence*

On October 1, 2005, Brandon reported to the emergency room ("ER") with depression and suicidal ideation. (Tr. 164-165.) He denied drug or alcohol abuse. (Tr. 164.) The next day, Brandon was admitted to Northcoast Behavioral Healthcare with the following diagnosis: major depressive disorder, single episode, without psychotic features; alcohol abuse; cannabis abuse; and nicotine dependence. (Tr. 106.) Brandon had recently broken up with his girlfriend and lost his job due to a strike. *Id*. Fifteen days after admission, he was discharged. His mental status was described as follows: he had spontaneous and coherent speech; his thoughts were organized, logical, and goal directed without any suicidal or homicidal ideation; no acute psychotic symptoms; his insight and judgment were good; and, his cognitive function was grossly intact. (Tr. 108.) He was judged to be "medically and psychiatrically stable" and had "received

maximum benefit of his psychiatric hospitalization." *Id*. His Global Assessment of Functioning ("GAF") score was determined to be 65.[1] (Tr. 109.) Upon discharge, his medications included Lexapro, Vistaril, and Nicoderm. (Tr. 108.)

On April 18, 2006, Brandon underwent an initial psychiatric evaluation at Pathways, Inc., a non-profit organization in Mentor, Ohio that provides mental health and emergency services. (Tr. 151-154.) Brandon was ascribed a GAF score of 60[2], his intelligence was rated as average, and no cognitive impairments were noted. (Tr. 160-161.) The severity of his illness was characterized as moderate. (Tr. 162.) Mental status findings included recurrent, unexpected panic attacks, fear of losing control/going crazy around crowds leading to avoidance of social situations, checking clothes, and feeling self conscious in stores/crowds. (Tr. 161.) He was diagnosed with major depressive disorder without psychosis, history of polysubstance abuse, and panic disorder without agoraphobia. *Id*.

On June 28, 2006, Robin Krause, RN, CNS, APN, completed a Physician Certification of Medication Dependency form for the Ohio Department of Jobs and Family Services. (Tr. 208.) Brandon's medications included Lexapro at 10 mg per day and Vistaril at 25 mg per day. *Id*.

On July 12, 2006, Brandon reported feeling better after taking the prescribed medication.

---

[1] A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning. A person who scores in this range may have a depressed mood, mild insomnia, or occasional truancy, but is generally functioning pretty well and has some meaningful interpersonal relationships. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

[2] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers. *See Diagnostic and Statistical Manual of Mental Disorders*, *supra*, at 34.

(Tr. 157-58.) Nurse Krause characterized the severity of his illness as moderate. *Id*.

On September 13, 2006, Nurse Krause noted Brandon's compliance with his medications, and that he was feeling more hopeful and optimistic. (Tr. 150.) His mood was stable and he reported an increased interest in life. *Id*. He was clean and sober at the time. *Id*.

On September 20, 2006, Danielle Halverstadt, a community support worker, filled out a Daily Activities Questionnaire regarding Brandon. (Tr. 126-127.) She reported that he was capable of household chores and personal hygiene, though he had limited ability to prepare food and had some difficulty in crowded stores. (Tr. 127.) Ms. Halverstadt indicated that Brandon got along with supervisors and coworkers at prior places of employment, worked hard, but that he kept mostly to himself and could not keep a job due to poor attendance. (Tr. 126.) Brandon was arrested for driving under a suspended license in August 2006, and started learning the public transit system. (Tr. 126-127.) Brandon was reliable and punctual for all appointments and was compliant with his medication. *Id*.

On October 25, 2006, Brandon was referred to Paul Josell, Psy. D., for a clinical interview and mental status examination. (Tr. 129.) Dr. Josell reported that Brandon had a history of alcohol, marijuana, and Tylenol PM abuse "with years of daily use." (Tr. 129). Brandon reported his interest in work would "fade" after a couple of months at a job, and that he left a GED class after the first session because he became frustrated. *Id*. Dr. Josell described Plaintiff's psychiatric history as significant for depression and anxiety since witnessing his father's murder at age 12. *Id*. However, medication had reportedly improved his mood and made him calmer. *Id*. On examination, Dr. Josell reported that Brandon "exhibited very appropriate interpersonal behavior and was able to clearly answer all questions presented to him.

4

He did not exhibit signs of anxiety or depression during the interview." (Tr. 130.) Also, his speech "was normal in rate, rhythm, and tone, with no articulation problems noted. Thought processes were generally organized, relevant and goal-directed." *Id*. Brandon's "[a]ffect was full in range, appropriate to thoughts." (Tr. 130-131.) He was ascribed a GAF score of 45.[3] Dr. Josell concluded that Brandon had the following limitations: moderate limitations in his ability to relate to others; no impairment in his ability to understand and follow directions; moderate difficulties in maintaining concentration, pace, or persistence; and moderate impairment in his ability to withstand stress and pressures associated with day-to-day work activity. *Id*.

Also on October 25, 2006, Todd Finnerty, Psy. D., completed a Mental RFC Assessment. (Tr. 132-46.) Dr. Finnerty found Brandon had the following limitations: mild limitations on activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, pace, or persistence; and, one to two episodes of decompensation. (Tr. 134, 145.) Within the category of "adaptation," Dr. Finnerty indicated that while Brandon would be moderately limited in his ability to respond appropriately to changes in the work setting, he would have no other significant limitations in that category. (Tr. 133.) He

determined Brandon's ability to "understand and follow directions" was not impaired. (Tr. 134.) However, his ability to sustain attention, concentration, and pace was moderately impaired. *Id*.

---

[3] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning. A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job. *See Diagnostic and Statistical Manual of Mental Disorders*, *supra*, at 34.

Dr. Finnerty concluded that Plaintiff could interact with co-workers and the public "on a superficial basis," and that he could adapt to a setting in which "duties are routine and predictable." *Id*.

On August 2, 2007, Brandon returned to Pathways and was seen by Nurse Krause. (Tr. 155-56.) He reported that Brandon was working on his GED and a job program. (Tr. 150-150A, 155-156.) Brandon's mood was reported as "mostly stable." (Tr. 155.)

On November 10, 2007, Brandon was seen by Nurse Krause who noted that Brandon had been clean and sober for one month, had no psychosis, suicidal or homicidal ideation, and had a stable mood. (Tr. 148.)

On December 27, 2007, Brandon told Nurse Krause that his medications made him feel better and calmer. (Tr. 223.)

On March 20, 2008, Brandon told Nurse Krause that he had a second job interview at a clothing store called Gabriel Brothers. (Tr. 219.) He had been clean and sober for over five months, had no psychosis, and was working on his GED. (Tr. 219-20.) At that time, he continued to be considered "moderately ill." (Tr. 219-24.).

On April 21, 2008, Brandon was taken to the ER after a suicide attempt. (Tr. 190-192; 217.) Brandon had been fired from his job and he ingested over 30 Lexapro pills. (Tr. 190, 199, 227.) He was sent to Northcoast Behavioral Healthcare, and, upon his discharge, he was diagnosed with major depressive disorder, in remission, and marijuana dependence. (Tr. 199-201.) Brandon's GAF score was 60 upon discharge. *Id*.

On May 15, 2008, Brandon reported to Nurse Krause that he was doing well on his antidepressants, was not suicidal, and that he needed to start a job search. (Tr. 215-16.)

6

On July 11, 2008, Brandon told Nurse Krause that he had relapsed. (Tr. 211-12.) His fourteen year old son was staying with him for the summer. *Id.* Nurse Krause reported no psychosis and characterized Brandon as moderately ill. *Id.*

An "Assessment of Ability To Do Work Related Activities (Mental)" form was addressed to Nurse Krause asking her then current estimate of Brandon's psychiatric/psychological impairments. (Tr. 203-05.) On August 8, 2008, Melvin Chavinson, M.D., completed the form addressed to Nurse Krause.[4] *Id.* Out of fifteen areas of limitation asked about, Dr. Chavinson indicated that Brandon had moderate limitations in one category, marked limitations in seven categories, and extreme limitations in seven categories. *Id.* Dr. Chavinson provided no additional commentary, and indicated that Brandon had not received a psychological evaluation. *Id.* Dr. Chavinson claimed that he had personally treated Brandon since 2007. (Tr. 205.) He also indicated that Brandon's condition was substantially the same since October 1, 2005 – over a year prior to his treating Brandon. *Id.*

On August 20, 2008, Brandon's case manager, Danielle Leone filled out a "Questionnaire - Mental/Emotional by Third Party" wherein she concluded that Brandon had a marked degree of limitation in activities of daily living and an extreme limitation in social functioning. (Tr. 226-227.)

*Hearing Testimony*

At the hearing, Brandon testified to the following:

---

[4] At the hearing, Brandon's counsel indicated that Dr. Chavinson supervised the nurses, who treated the patients at Pathways. (Tr. 269.) Brandon has not pointed to any portion of the record, beyond the aforementioned questionnaire, that would indicate Dr. Chavinson ever personally treated him.

- He lives alone in an apartment and receives a Section 8 housing subsidy. (Tr. 233.)

- He is single and has one child, a fourteen year old son, who lives with the child's mother. (Tr. 234.)

- He cannot drive legally and takes the bus. (Tr. 235.)

- The last grade he completed was the ninth grade; but he was not in special education classes. (Tr. 236)

- He gets nervous around people, sweats, and feels like he is going to faint. (Tr. 237.)

- He had a part-time janitorial job at Gabriel Brothers with the assistance of the State Bureau of Vocational Rehabilitation (BVR), but it ended when he failed to arrive at work, because he did not have transportation. (Tr. 239-40.)

- His typical day involves waking up, taking his medication, feeding his cat, trying to clean his apartment; and smoking cigarettes outside with his neighbors. (Tr. 245.)

- He is compliant with his prescribed medications. (Tr. 251.)

Danielle Leone, Brandon's caseworker at Pathways, also testified at the hearing. She stated that she had to teach Brandon, who had been homeless for some time, basic skills of daily living such as paying bills, grocery shopping, and using a food stamp card, etc. (Tr. 254.) She further stated Brandon had good hygiene and kept his apartment clean. (Tr. 256.) She pointed out that Brandon was "extremely compliant" with medications and never missed an appointment with her. (Tr. 256.) She had never seen Brandon comfortable in social situations. *Id*. She felt that Brandon could not tolerate a walk through the mall, because he would become anxious and fidgety due to the number of people there. (Tr. 255-56.)

The ALJ asked the VE to consider a hypothetical individual with the following limitations:

8

> ... what I'd like you to assume is a younger individual with a ninth grade education. And I'd like you to assume that the individual does not have any physical limitations but – and there's no past work, at least not that's vocationally relevant. And such an individual would be limited to simple, routine tasks with no interaction with the general public. And I want to clarify what I mean by interaction. I'm not saying no contact with the general public, but I mean no interaction in which the person would need to speak to the general public, answer questions, offer assistance, that sort of thing. And then interaction with co-workers and supervisors would need to be superficial. And then let's also assume a work environment with no more than 25 to 30 people present at one time.[5]

(Tr. 263-64.)

The VE testified that there would be work for such an individual in the sedentary, light, and medium exertional categories. (Tr. 265.) The VE testified that, according to the Dictionary of Occupational Titles ("DOT"), such an individual could perform the following jobs: housekeeper (1000 jobs in northeast Ohio, 450,000 nationally), DOT #323.687-014, which is a light unskilled job; cafeteria attendant (900 jobs in northeast Ohio, 250,000 nationally), DOT #311.677-010, which is a light unskilled job; and hand packager (850 jobs in northeast Ohio, 325,000 nationally), DOT #559.687-084, which is a light, unskilled job. (Tr. 265-66.)

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a

---

[5] After the VE stated that he has no normative data on the number of people present in a work environment, the ALJ eliminated the portion of the hypothetical that limited the work environment to 25 to 30 people. (Tr. 264-65.)

9

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[6]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A claimant may also be entitled to receive SSI benefits under the Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV. Summary of Commissioner's Decision

The ALJ found Brandon established medically determinable, severe impairments, due to major depressive disorder and substance abuse; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Brandon has a Residual Functional Capacity ("RFC") for a limited range of work due solely to non-exertional limitations. The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Brandon is not disabled.

---

[6] The entire five-step process entails the following: First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

*Dr. Chavinson as a Treating Physician*

Brandon argues that the ALJ failed to give proper weight to the opinion of his treating physician, Dr. Chavinson.  (Pl.'s Br. at 12-15.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)).  "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*,

11

581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 F. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[7]

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with other substantial evidence in the case record.") (*quoting* SSR 96-2p).

Dr. Chavinson completed a mental assessment form indicating that Brandon had moderate limitations in one category, marked limitations in seven categories, and extreme limitations in seven categories. (Tr. 203-05.) He further indicated that Brandon's impairments and/or treatment would cause him to be absent from work over three times per month. *Id*. The ALJ discussed Dr. Chavinson's opinion as follows:

---

[7] Pursuant to 20 C.F.R. § 404.1527(d), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

> The record also contains a check-off form Assessment of Ability to do Work-Related Activities (Mental), signed by Melvin Chavinson, M.D., the supervising psychiatrist at Pathways, at the request of the claimant's attorney on August 8, 2008. (Exhibit (12F). Dr. Chavinson checked off marked or extreme limitations in each and every item except for one, and checked off that that the claimant would miss work on average more than three times per month. Dr. Chavinson did not write any narrative support for his ratings. Dr. Chavinson's ratings are not consistent with or supported by the actual treatment notes from Pathways, for the reasons already stated in the preceding paragraph.[8] At an interview in April 2006 the claimant was believed to be "moderately ill" and rated a GAF of 60. In August 2007 the claimant was again considered "moderately ill." As of July 2008 he was still considered "moderately ill" (Ex. 8F, pp. 15, 16, 10; 14F). I resolve the inconsistency by giving greater weight to the actual treatment notes, since they were prepared in the course of treatment and for the actual purpose of treatment, so they are inherently more reliable. In addition, I note the form queries, "has the patient's severity of limitations existed since at least 10/01/05?" and that in response, Dr. Chavinson checked "Yes." However, Dr. Chavinson was not treating the claimant as of October 1, 2005, and treatment at Pathways did not begin until more than 6 months later. Either Dr. Chavinson did not take the time to check when treatment actually began, or else he was willing to speculate without any basis of personal knowledge. In either event, this casual approach to evidence while completing the form also calls into question the reliability of Dr. Chavinson's ratings on the form.

(Tr. 20-21.)

The ALJ gave little weight to Dr. Chavinson's opinion because it was not consistent with the other substantial evidence in the record. Pursuant to 20 C.F.R. § 404.1527(d)(3), "the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." Here, it was not improper for the ALJ to discount Dr. Chavinson's opinion where it contained no explanation for the severity of his findings or any reference to Brandon's course of treatment. Where a

---

[8] In the preceding paragraph, the ALJ noted that the treatment notes from Pathways indicate that Brandon was "moderately" ill and that Brandon was "encouraged and required to apply for employment." (Tr. 20.)

13

physician fails to identify objective medical findings to support his opinion, an ALJ does not err in discounting his opinion. *See, e.g., Price v. Comm'r of Soc. Sec.*, 2009 U.S. App. LEXIS 18772 at *9 (6th Cir. Aug. 18, 2009) (*citing Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation."))

In addition, it is questionable whether Dr. Chavinson should be considered a treating physician. The ALJ did not identify him as such, but merely referred to him as the "supervising psychiatrist" at Pathways. (Tr. 20.) This information apparently comes from Brandon's counsel during the hearing. (Tr. 269.) However, Brandon has not pointed to a single piece of medical evidence in the record indicating that Dr. Chavinson personally treated him. All of the treatment notes from Pathways are signed by Nurse Krause. Brandon also fails to cite any law suggesting that a physician acting solely in a supervisory capacity qualifies as a treating physician. In a similar case, a district court found that an ALJ did not err by failing to accord treating physician status upon a physician who did not do "anything more than sign off on the form Intake Summary, refer plaintiff for treatment, and sign off on the medical statement with [the nurse practitioner who treated plaintiff]." *Ceballos v. Astrue*, 2009 U.S. Dist. LEXIS 71025 at *5 (D. Kan. Aug. 12, 2009). Here even the Initial Psychiatric Evaluation at Pathways was performed by Nurse Krause. (Tr. 159-62.) As such, the ALJ's decision to give little weight was not improper.

*Evaluation of Dr. Josell's Opinion*

Brandon asserts that the ALJ failed to fully analyze the opinion of consultative examiner Dr. Josell. (Pl.'s Br. at 16-17.) Brandon concedes that the ALJ addressed the opinion of Dr. Josell, though did not fully explain the weight his opinion was ascribed. *Id*. Brandon cites the

14

following statement from Dr. Josell's report: "Brandon's mental ability to *withstand the stress and pressures associated with day-to-day work activity* is moderately impaired at this time.  His depressive and anxious symptoms would interfere with his ability to consistently and effectively perform at a job at this time." (Tr. 131.)

The ALJ noted that Dr. Josell believed that Brandon was moderately impaired in his ability to withstand the stress and pressures associated with day-to-day work activity and, therefore, limited him to "simple routine tasks with no interaction with the general public and superficial interaction with co-workers and supervisors."  (Tr. 20.)  As the Court understands Brandon's argument, however, the deficiency in the ALJ's opinion is that he did not construe Dr. Josell's above cited statement as an opinion that Brandon was incapable of gainful employment.  As argued by Brandon in his brief, "[a] fair reading of Dr. Josell's opinion, beyond the use of the undefined term 'moderate,' makes it clear that Dr. Josell was of the opinion that Brandon was not mentally capable of employment ...."  (Pl.'s Br.at 16.)  To the extent Dr. Josell was making a conclusion as to Brandon's ability to work, an opinion that a claimant is disabled is an issue expressly reserved for the Commissioner and does not constitute a medical opinion. 20 C.F.R. § 404.1527(e). An ALJ need not give any weight to a conclusory statement of a treating physician that a claimant is disabled, and may reject determinations of such a physician when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Sec' of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984).  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled," as it is the Commissioner who must make the final decision on the ultimate issue of whether an individual

15

is able to work.  *See* 20 C.F.R. § 404.1527(e)(1); *Duncan*, 801 F.2d at 855; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Furthermore, it was not unreasonable for the ALJ to conclude that Dr. Josell's "moderate" limitation in this area was not a work *preclusive* restriction.  The ALJ limited Brandon to simple, routine tasks with no interaction with the general public and to only superficial interaction with co-workers and supervisors.  (Tr. 20.)  These limitations constitute a reasonable interpretation of the moderate limitations found by Dr. Josell and are supported by substantial evidence of record.  Brandon essentially urges this Court to substitute his own interpretation of Dr. Josell's opinion with that of the ALJ's, and to convert Dr. Josell's "moderate" limitation into a "marked" or "extreme" limitation consistent with Dr. Chavinson's opinion.  (Doc. No. 17 at 16.)  Although Brandon disagrees with the ALJ's characterization of Dr. Josell's opinion, this Court does not conduct a *de novo* review and cannot remand a matter simply because it might have interpreted the evidence of record differently than the ALJ.  Here, the ALJ's explanation is not unreasonable and can be supported by the record.

*Credibility of Danielle Leone*

Brandon avers that the ALJ erred by not making a specific credibility finding with respect to the portion of Ms. Leone's testimony that addressed Brandon's mental functioning. (Pl.'s Br. at 17-19.)

It is undisputed that the ALJ discussed at least part of the testimony given by Ms. Leone, albeit, as conceded by counsel, the ALJ misidentified her in his opinion as Robin Krause.  (Tr. 18-20.)  Rather, Brandon asserts that the ALJ omitted any discussion of key portions of her testimony and failed to evaluate or explain his reasons for apparently disbelieving her testimony.

Pursuant to 20 C.F.R. § 404.1513(d)(3), Ms. Leone would be characterized as an "other source," whose opinion is not entitled to any special weight.  Nonetheless, according to Social Security Ruling ("SSR") No. 06-03p, 2006 SSR LEXIS 5 at \*\*15-16 (Aug. 9, 2006):

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision in hearing cases and in the notice of determination (that is, in the personalized disability notice) at the initial and reconsideration levels, if the determination is less than fully favorable.

*See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (noting that the ALJ should have provided some basis as to why he was rejecting the opinion of an "other source"); *Phillips v. Comm'r of Soc. Sec.*, 2008 U.S. Dist. LEXIS 90627 at \*12 (W.D. Mich. Jul. 2, 2008) (ALJ's failure to address a nurse practitioner's opinion pursuant to SSR 06-03p amounted to error, but was, nonetheless harmless); *Hatfield v. Astrue*, 2008 U.S. Dist. LEXIS 46702 at \*\*7-8 (E.D. Tenn. Jun. 13, 2008) (noting that "[t]he Sixth Circuit ... appears to interpret the phrase 'should explain' as indicative of strongly suggesting that the ALJ explain the weight [given to an 'other source' opinion], as opposed to leaving the decision whether to explain to the ALJ's discretion").

In his opinion, the ALJ discussed the most pertinent portions of Ms. Leone's testimony. (Tr. 18-20.)  Though the ALJ did not precisely explain the weight given to the testimony of Ms. Leone, the ALJ's decision as a whole is clear enough to allow this Court to follow the ALJ's

reasoning. Though Ms. Leone's testimony indicates that Brandon was uncomfortable and anxious in public places and in social situations generally, the ALJ's discussion of evidence that tends to show Brandon's anxiety was not as limiting as alleged by Leone was sufficient to inform both claimant and this Court of the ALJ's rationale. Notably, the ALJ makes specific references to Brandon's previous employment that involved at least some amount of interaction with others and the fact that Brandon lost these jobs for reasons completely unrelated to his mental impairments. (Tr. 18.) Moreover, Brandon testified that he liked his most recent job and was sorry to lose it. *Id*. The ALJ justifiably ascribed more weight to Brandon's own testimony and work history than to Ms. Leone's observations. Therefore, while it may have been advisable for the ALJ to explain precisely what weight he was giving to Ms. Leone's opinions, the ALJ's analysis was not so deficient as to run afoul of SSR 06-03p.

As such, Brandon's final assignment of error is without merit.

### VII. Decision

For the foregoing reasons, the Magistrate Judge finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner should be AFFIRMED and judgment entered in favor of the defendant.

s/ Greg White<br>U.S. Magistrate Judge

Date: January 27, 2010

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order.** *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981).** *See also Thomas v. Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**